LUIS BARRETO,. Plaintiff-Appellee, v. THE CITY OF WAUKEGAN, Defendant-Appellant (North Shore Gas Co., Defendant-Appellee).

Second District   No. 84—140

Opinion filed May 7, 1985.

Donald Ridge and Edward R. Tomkowiak, both of Waukegan, for appellant.

Robert J. Hauser, of Sullivan, Smith, Hauser & Noonan, Robert L. Snook, of Hall, Holmberg, Sloan, Roach, Johnston & Fisher, and Edward A. Puisis, all of Waukegan, for appellees.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, the city of Waukegan, appeals from a judgment following a jury verdict entered in favor of plaintiff, Luis Barreto, for $93,000 in damages for injuries plaintiff sustained when he tripped on a cracked and depressed area of the sidewalk in front of his house. The city raises the following issues on appeal: (1) whether the trial

court erred in permitting the voluntary dismissal of another defendant, North Shore Gas Company (North Shore), over the city's objection; (2) whether the trial court improperly admitted certain testimony and exhibits; (3) whether the trial court erroneously instructed the jury; (4) whether the trial court should have granted the city's motion for a directed verdict and judgment *n.o.v.*, or alternatively, a new trial; (5) whether plaintiff's counsel's improper remarks made during closing argument improperly influenced the jury; and (6) whether the city was denied a fair and impartial trial due to the cumulative effect of the trial court's erroneous rulings and plaintiff's counsel's improper conduct.

Plaintiff commenced this action by filing a two-count complaint charging the city and North Shore with negligence. In count I, plaintiff alleged, *inter alia*, that the city, having a duty to exercise reasonable care to maintain sidewalks in a reasonably safe condition for ordinary use, on or about April 14, 1981, permitted the sidewalk at 41 South Martin to be and remain in a poor state of construction and repair, had notice and knowledge of the existence of a dangerous condition prior to April 14, 1981, in ample time to have remedied and repaired the sidewalk, and thus directly and proximately caused the injuries sustained by plaintiff when he stumbled, tripped, and fell over and upon the depression in the sidewalk. In count II, plaintiff alleged that, after conducting excavation and construction work at 41 South Martin, North Shore failed to exercise reasonable care, causing the sidewalk to have a depression so that it was uneven, rough, and unsafe for pedestrian use and failing to restore the area to a condition of safety.

Prior to the beginning of trial, plaintiff petitioned the trial court to enter an order dismissing North Shore and finding that North Shore entered into a good-faith settlement with plaintiff, stating that North Shore offered to pay $12,500 in full and complete settlement of its liability, that counsel for plaintiff and counsel for North Shore believed that North Shore's liability was substantially less than the city's, that $12,500 was a fair and reasonable settlement of the cause of action against North Shore, and that the discussions concerning the proposed settlement were shared with counsel for the city, but he refused to participate in the settlement process. The trial court, after hearing the statement of plaintiff's counsel respecting injuries, facts and settlement discussions, found that the proposed settlement of North Shore's liability was in good faith and dismissed North Shore as a party on the basis of the settlement. While the trial court allowed the city leave to file written objections, none were ever filed.

At the jury trial, plaintiff testified that he lived at 41 South Martin, Waukegan, since 1977 with his wife, his son Marcus, and his stepson Donald, who was in the Air Force. In late 1977 or the beginning of 1978, there was construction work where North Shore was looking for a gas leak, and after they were finished digging, they refilled it with the same dirt and then put some kind of pavement on it. About six months later, the sidewalk started breaking down. Plaintiff said that when the sidewalk started to settle or depress and crack, he called North Shore, but no one came. According to plaintiff's testimony, he waited about a week and called the city, explained the situation, and told them his name and address, and they said they would notify the superintendent, but no one responded. A week or so later, he called again, and again nobody came out.

Plaintiff recalled that on April 14, 1981, he had worked from midnight until 8 a.m. as a jailor in the Lake County sheriff's office. When he got home, he did some things in the backyard and then went into his small office next to his garage and looked at drivers' education books because he worked in drivers' education part-time. He saw his gate open and, wondering where his little dog was, saw the dog was running out. He followed the dog across the lawn to the sidewalk, and, reaching the sidewalk, his right foot tripped on the crack and he fell on his left leg, breaking his left ankle. He stated that when he tripped, he was looking where his dog was going. As he was trying to get up, his stepson Derwin Fermaint happened to come by, got out of the car, and pulled him inside the house. An ambulance took him to Victory Hospital, where he remained from April 14 until April 30, and was treated by Dr. Fetter and Dr. Soriano. He was not able to work while he was in the cast, and after the last cast was removed, he was on crutches for a long time. On September 9 or 10, 1981, Dr. Fetter allowed him to go back to work, but said he could do only light-duty work. After awhile he had a number of pains, and the pins started getting loose. He had the pins removed on September 10, 1982, and at the same time had a hernia operation, which had nothing to do with the original accident. Before the operation, he had been dismissed from his job over a disagreement with the sheriff. After the operation, he had therapy, had to wear high-heeled boots, and could return to work in January 1983 with restrictions. Plaintiff stated that his ankle is numb, unstable and does not have all its strength. Plaintiff further stated that bills, identified as plaintiff's group exhibit No. 5, all resulted from the accident of April 14, 1981, and all were paid except for less than $300 to Dr. Fetter and $14 to the hospital.

The city objected to the admission of the bills on the basis of im-

proper foundation, contending the individual bills should be submitted one at a time and testified to so there would be a proper foundation for each one. The trial court admitted the exhibit, stating that sufficient foundation had been laid and that the city could cross-examine as to each one separately, although the city chose not to do so.

Robert Johnson, called as an adverse witness, testified that he was the director of public works for the city of Waukegan, which included the position of superintendent of the streets department. The streets department handles minor maintenance of sidewalks, and the engineering department is responsible for major reconstruction. When someone calls and complains, Vernette Hellstrom, the secretary, prepares a request report form, forwards it to him, and he forwards it to a foreman to go out and inspect. There are also sidewalk inspection request forms that are forwarded to the engineering department. The streets department does not keep these in its files, and it has no follow-up as to whether the engineering department acted. Vernette Hellstrom substantiated Johnson's testimony.

Plaintiff was recalled and stated that he generally made $1,000 to $1,500 per year working part-time for Cosmopolitan Driving School, but because he was unable to work between April 14 and September 1981, he made about $500 in 1981.

Ramona Barreto, plaintiff's wife, testified that the sidewalk was level when they moved in in 1977. In the fall of 1977, the gas company did repair work, but when they were done with the repair work, they did not put enough ground there, and when it rained, the sidewalk started going down and cracked. Her son, Daniel, complained to the city of Waukegan regarding the broken-up sidewalk in 1979, but nothing happened to the sidewalk. As for her husband's condition, she stated that sometimes he limps and his ankle swells and is discolored.

Derwin Fermaint, another of plaintiff's stepsons, testified that around noon on April 14, 1981, as he pulled up to his parents' home, he saw his stepfather lying on the sidewalk. He helped his stepfather get up and into the house and observed plaintiff had some deformity to his ankle and there was an abrasion from which he was bleeding. Fermaint called an ambulance, and plaintiff was transported to the hospital. Fermaint said that since the accident, plaintiff does not walk straight or as normally as he used to, he seems to wobble, complains of a lot of pain, and has to wear certain boots to give the ankle strength. Fermaint testified that plaintiff is at home more now rather than out and walking.

John Paul Lewis, who lives at 43 South Martin, testified that the sidewalk in front of the Barreto home was in poor repair, and that he

had stumbled over it once or twice but did not fall. As plaintiff's counsel began to ask about differences in plaintiff, the city objected, arguing the line of questioning was repetitive in that plaintiff, his wife, and his stepson had testified. Plaintiff's counsel responded that the others were relatives and Lewis was a neighbor, and the objection was overruled. Lewis continued with his testimony, stating that plaintiff used to be rather active around the yard, but he did not see much of him out in his yard any more and that plaintiff used to go out in the winter and shovel snow, take care of his yard, and work in his garage, and Lewis did not see much of that anymore.

Alvernia May Beskow, secretary to the sheriff of Lake County, testified that she was keeper of the records as far as personnel and that during the 1981 period, plaintiff was paid $618.72 every two weeks, but was not paid between April 14, 1981, and September 10, 1981.

Dr. Marvin R. Fetter, an orthopedic surgeon, testified that he saw plaintiff in the emergency room on April 14, 1981, at Victory Memorial Hospital, where a history was taken, a physical examination conducted, and treatment rendered. Dr. Fetter realigned the bone, and a long leg cast was applied. Displacement of the inner bone of the ankle persisted, and subsequently cuts were made over the fracture site and the bones were put together and secured with pins, plates, and screws. Plaintiff was re-hospitalized in September 1982 to remove the retained orthopedic hardware in his ankle. Plaintiff was in the hospital for nine days, and the normal hospitalization period is five to 14 days. During the hospitalization of September 1982, plaintiff also had a hernia operation. Charges on the September 1982 hospital bill were all related to the treatment he rendered plaintiff for his ankle. During an examination of plaintiff in January 1983, Dr. Fetter found that there was a diminution of range of motion and the bone surface of the bone just above the ankle was not smooth, which is compatible with arthritic change, and advised plaintiff to perform no job requiring climbing. Dr. Fetter did not believe the range of motion would improve, and believed plaintiff may have intermittent pain and swelling, which may vary in intensity. On cross-examination, Dr. Fetter was unable to break down which part of the September 1982 hospital bill was for the hernia and which was for the orthopedic services.

The only evidence presented by the city was the testimony of plaintiff, called as an adverse witness. Plaintiff stated that on an application to get a job with the city as an inspector on January 10, 1983, he answered no to the question whether he had any physical or mental condition which might prevent him from performing the duties

of the position. Under examination by his own counsel, plaintiff explained that he answered no on the application because when "you're old it's hard to get a job," and if he said he had a fracture or something, he would be automatically discharged.

The jury returned a verdict in favor of plaintiff for $93,000, and judgment was entered on the verdict. The city filed a post-trial motion, which was denied on November 30, 1983. Even though the motion had been denied, North Shore filed an affidavit on December 20, 1983, in opposition to a part of the post-trial motion. The affidavit, which was by North Shore's counsel, outlined the settlement process and final result. The trial court vacated its earlier denial of the post-trial motion, and granted the other parties leave to respond.

In an order entered on January 18, 1984, the trial court found that North Shore's affidavit and the city's reply merely stated the facts that were provided to the court at the time of the court's approval of the settlement, and did not add new facts but recited them for the purposes of the record; that the facts were not in dispute at the time of the court's approval nor at the time of post-trial proceedings; that there was therefore no reason for an evidentiary hearing; and that the city's post-trial motion and supplemental pleadings were without merit; and denied the post-trial motion.

■ The city first argues that there should have been either a jury or bench trial to determine whether the settlement between plaintiff and North Shore was made in good faith. The settlement could not be found to be in good faith, the argument continues, without affidavits or testimony showing the percentage of liability between defendants and the extent of plaintiff's damages.

Section 2 of the Illinois Contribution Act (Ill. Rev. Stat. 1983, ch. 70, par. 301 *et seq.*) provides, in pertinent part:

> "(c) When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater.

> (d) The tortfeasor who settles with a claimant pursuant to paragraph (c) is discharged from all liability for any contribution to any other tortfeasors." (Ill. Rev. Stat. 1983, ch. 70, pars. 302(c) and (d).)

The requirement that a release or covenant be given in good faith gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge. (Uniform Contribution Among Tortfeasors Act sec. 4, 12 Uniform Laws Annotated 98, Commissioners' Comment, at 99 (1975).) The statute does not set forth any specific procedural requirements for determining whether a settlement is given in good faith. Two districts of the Illinois appellate court have addressed this question, and both have declined to require separate evidentiary hearings for the determination of good faith. (See *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 96, 463 N.E.2d 793; *Pell v. Victor J. Andrew High School* (1984), 123 Ill. App. 3d 423, 435, 462 N.E.2d 858.) Instead, under the facts in those cases, it was held that the issue of good faith may be determined by the trial court based on arguments of counsel (see *Pell v. Victor J. Andrew High School* (1984), 123 Ill. App. 3d 423, 435, 462 N.E.2d 858), or on the basis of affidavits, depositions, and other discovery materials of record, and, at the trial court's discretion, other evidence received at the hearing. (*Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 96, 463 N.E.2d 793.) Although the court in *Lowe* stated, in *dictum*, that if a hearing is requested, the trial court is required to hold one, it is unclear whether that means an evidentiary hearing and what, if any, preliminary showing of bad faith is necessary by the party requesting the hearing.

We believe that the trial court is in the best position to decide what type of hearing is necessary to fully adjudicate the issue of good faith. Here, plaintiff represented to the trial court in his written motion to dismiss North Shore filed before trial, and again after trial in the affidavit of North Shore's counsel, that a settlement had been reached in good faith between plaintiff and North Shore and what the terms of the settlement were. Once there has been such a preliminary showing that a good-faith settlement has been made, we believe the burden of proof on the issue of good faith of the settlor shifts to the party who claims that the settlement was not made in good faith or is collusive. (See *Fisher v. Superior Court* (1980), 103 Cal. App. 3d 434, 447, 163 Cal. Rptr. 47, 56; see also O'Leary, *Good Faith Settlement and Release Agreements under the Illinois Contribution Act*, 73 Ill. B.J. 82 (1984).) Although we do not have included in the record on appeal the transcript of the hearing on the motion to dismiss North Shore or of the post-trial hearing, which is the city's responsibility as appellant to provide to this court (see *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92, 459 N.E.2d 958), the city has neither alleged bad faith nor explained why the settlement was not made in good faith in

any of its pleadings or memoranda in the proceedings below. The city was granted leave to file written objections to the trial court's finding of good faith, but no written objections were ever filed. The record indicates the city was not unaware of the settlement conferences prior to trial, and the city has not disputed that it was given the opportunity to settle for $12,500, the same amount given by North Shore to plaintiff in settlement, but chose not to settle for that amount. On these facts, we conclude that the trial court did not abuse its discretion by refusing to conduct an evidentiary hearing.[1]

■ We are not constrained to reach a different conclusion by the city's argument that a settlement could not be determined to be in good faith unless there is a showing in an evidentiary hearing or by proper affidavits as to the percentage of liability among the parties and as to the extent of plaintiff's damages. The amount a plaintiff settles for may be far different from the eventual determination of the damage award by the jury. Therefore, it is virtually impossible to use an unknown factor—the jury's verdict—to test good faith prior to trial. (*Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 94, 463 N.E.2d 793.) As stated above, where the city has failed to allege bad faith or any basis for wrongful or collusive conduct in the settlement, there is no necessity for an evidentiary hearing, nor is it necessary to make a showing of the relative percentage of liability among the parties.

■ From our conclusion that it is within the trial court's discretion to decide whether to hold an evidentiary hearing, it follows that the city was not entitled to trial by jury as it claims by virtue of article I, section 13, of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 13). The right to trial by jury does not extend to special or statutory proceedings unknown at common law (see *In re Estate of Millsap* (1979), 75 Ill. 2d 247, 255, 388 N.E.2d 374), and as this issue of a good-faith settlement arises under the Illinois Contribution Act where no provision granting the right to a jury trial is provided, no right to a jury trial attaches. See *In re MGM Grand Hotel Fire Litigation* (D. Nev. 1983), 570 F. Supp. 913.

■ The city next contends that the trial court erred in admitting

---

[1]The issue is not raised in this appeal as to when the issue of the good faith of a settlement between plaintiff and one of several joint tortfeasors should be determined in relation to the trial of the tort issues. Here, the petition was made and granted prior to trial, but considered again, and additional arguments made after trial. It would appear the appropriate time to decide the issue of good faith is in advance of trial. See *Fisher v. Superior Court* (1980), 103 Cal. App. 3d 434, 163 Cal. Rptr. 47; *In re MGM Grand Hotel Fire Litigation* (D. Nev. 1983), 570 F. Supp. 913.

the medical bills as a group exhibit, without foundation as to each individual bill, and where there was no testimony connecting the bills to the accident or showing reasonableness.

The law is settled in this State that in order to recover for medical and surgical expenses, it is necessary that two things be proved; first, that the claimant has paid or become liable to pay a specific amount, and second, that the charges made were reasonable charges for services of that nature. (*Wicks v. Cuneo-Henneberry Co.* (1925), 319 Ill. 344, 349, 150 N.E. 276.) The prevailing rule is that the hospital or doctor's bill is *prima facie* reasonable and a proper foundation is laid when plaintiff testifies that the bill was for services rendered to him and that the bill has been paid. *Flynn v. Cusentino* (1978), 59 Ill. App. 3d 262, 266, 375 N.E.2d 433.

The city objected to the admission of the bills at trial on the basis that a separate foundation must be laid for each individual bill. The city, however, was given the chance to cross-examine as to each bill separately, but declined to take advantage of that opportunity. Whether related bills may be submitted as a group exhibit rests within the discretion of the trial court and, under the circumstances here, we find no abuse of discretion.

■ In addition, while the city now complains that there was no testimony connecting the bills to the accident or showing of reasonableness, it did not object to the admission of the bills at trial on this basis. Specific objections to evidence, based solely on particular grounds, are a waiver of objections to all grounds not specified or relied upon. (*Spencer v. Burns* (1952), 413 Ill. 240, 249, 108 N.E.2d 413; *Johnson v. Hoover Water Well Service, Inc.* (1982), 108 Ill. App. 3d 994, 1007, 439 N.E.2d 1284.) In any event, here the evidence included testimony by plaintiff that all the bills were paid, except for $14 to the hospital and less than $300 to Dr. Fetter, and that they all related to the accident. There was also testimony by Dr. Fetter, explaining generally the medical services rendered to plaintiff and that those services related to treatment rendered to plaintiff for his ankle. Thus, we believe that a sufficient foundation was laid for these bills, which were all clearly related to the injury sustained by plaintiff to his ankle.

■ The city next argues that it was error to admit the hospital bill from plaintiff's second hospitalization in September 1982, and by editing out the higher of two charges for certain hospital services on the assumption that those were for the hernia surgery, also performed during the second hospitalization, and submitting the edited version along with the complete bill to the jury. While the city also complains

that there was no showing of reasonableness of the charges or that the bill was paid, this bill, plaintiff's exhibit No. 27, was originally in the group exhibit when plaintiff testified that all but $14 had been paid, but was not sought to be admitted until Dr. Fetter's testimony, at which time it was marked as plaintiff's exhibit No. 27. Thus, there was evidence that the bill was paid.

■ As a result of Dr. Fetter's inability during cross-examination to break down the anesthesia charge between the ankle and hernia surgery, which were performed during a single period of operation, and to distinguish between the two surgery room charges, the trial court deleted the anesthesia charge and the greater of the two surgery room charges and submitted those deletions to the jury. The city objected to the entire original bill, but made no objection as to the manner in which the deletions were submitted and thus cannot challenge that procedure now. In light of Dr. Fetter's testimony that the charges all related to treatment for plaintiff's ankle and the city's cross-examination as to only three items, two of which were deleted by the trial court, we do not believe that the trial court abused its discretion or that the city was prejudiced.

■ The city also complains that John Lewis' testimony was cumulative and emphasized plaintiff's condition. The general rule is that a trial court, in the exercise of a sound and reasonable discretion, has the power to limit the number of witnesses who shall testify to a particular fact. (*Geohegan v. Union Elevated R.R. Co.* (1915), 266 Ill. 482, 486, 107 N.E. 786; *Yang v. Special Charter School District No. 150* (1973), 11 Ill. App. 3d 239, 242, 296 N.E.2d 74.) Here, only four witnesses—plaintiff, his wife, his stepson, and Lewis—testified to the change in plaintiff's habits as a result of his ankle injury. Three of those could be viewed by the jury as having an interest in the outcome of the case. Lewis was a disinterested party and, as a neighbor, could present a different perspective so that his testimony was not merely cumulative. We therefore believe that the trial court did not abuse its discretion in admitting the testimony of Lewis.

■ The city's final contention of evidentiary error is that the court erred in admitting photographs, plaintiff's exhibit Nos. 8 through 12, without testimony that they depicted the area of the accident on the day of the accident. Admission of photographs requires some foundation to establish that the area depicted was in substantially the same condition as it was at the time of the accident. (*Casson v. Nash* (1978), 74 Ill. 2d 164, 171, 384 N.E.2d 365.) However, the admission of photographs is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Pace v. McClow*

(1983), 119 Ill. App. 3d 419, 427, 458 N.E.2d 4.

■■■ Joe McAndrews, the photographer, testified that he took the photographs labeled plaintiff's exhibit Nos. 2 and 3 and 8 through 12 all on the same day in late May 1981. He further testified that plaintiff's exhibits Nos. 8 through 12 depict pictures of the hole shown in plaintiff's exhibits Nos. 2 and 3. All these photographs are of the sidewalk area where plaintiff fell. Plaintiff testified that plaintiff's exhibits Nos. 2 and 3 truly and accurately depicted the way the sidewalk looked on April 14, 1981. As all the photographs were taken of the same area in question, and plaintiff confirmed that two of them accurately depicted the sidewalk on the day of the accident, there was a sufficient basis for the admission of all the photographs, including plaintiff's exhibits Nos. 8 through 12.

■■■ The city next argues that the trial court erred in giving both plaintiff's instructions Nos. 14, IPI Civil 2d 140.01 (Illinois Pattern Jury Instructions, Civil, No. 140.01 (2d ed. 1971)) ("A city has a duty to use ordinary care to maintain sidewalks in a reasonably safe condition.") and No. 18, IPI Civil 2d No. 10.04 ("It was the duty of the defendant, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff. That means it was the duty of the defendant to be free from negligence.") because they were repetitive and placed too much emphasis on duty, misleading the jury to believe that a higher standard of care was involved.

Repetition alone in instructions is not reversible error. (*Riley v. Johnson* (1981), 98 Ill. App. 3d 688, 695, 424 N.E.2d 842.) Merely because the court restates the law in another instruction does not necessarily mean that the court unduly emphasized any point in favor of either litigant. (98 Ill. App. 3d 688, 695, 424 N.E.2d 842.) Here, both instructions concern "ordinary care," and no reasonable reading of the two together would indicate a standard of care other than "ordinary" was to be applied, nor are the instructions contradictory or confusing. While it has been suggested that it might not be desirable to give both of these instructions, error is not committed when both are given. *Rehak v. City of Joliet* (1977), 52 Ill. App. 3d 724, 726-27, 367 N.E.2d 1070.

■■■ The city next contends that the trial court erred in refusing to give three tendered instructions on its theory of the case, which was that plaintiff contributed to his own injuries. All three of those instructions are non-IPI instructions which lift sentences from court decisions, a practice not recommended. (*DeRosa v. Albert F. Amling Co.* (1980), 84 Ill. App. 3d 64, 75-76, 404 N.E.2d 564.) The jury was instructed on the duty of the plaintiff to use ordinary care for his own

safety, which was sufficient to present the city's contention that plaintiff contributed to his own injuries.

The city also argues that giving plaintiff's instruction No. 15, which required the jurors to fix damages if they found in plaintiff's favor, was erroneous because it made no reference to abatement for plaintiff's comparative fault and thus caused "an overemphasis and distortion" in plaintiff's favor. Plaintiff's instruction No. 15 on the measure of damages consists of IPI Civil 2d Nos. 30.01, 30.04, 30.05, 30.06, and 30.07. However, the jury was instructed as to contributory negligence in plaintiff's instruction No. 17A, IPI Civil 2d No. A10.03, and was instructed to allow for plaintiff's contributory negligence, if any, in apportioning damages on the special verdict form. Considering the totality of the instructions, we find the jury was properly instructed in this regard.

Next, the city argues that its tendered special verdict form, which was refused and which allowed the jury to attribute negligence to both the city and North Shore, should have been given in order to have the jury properly assess the negligence of North Shore. The only basis for this contention of error which the city makes on appeal is that the absence of this verdict form prevented the court from considering all the facts in determining whether a good-faith settlement existed. As we have already concluded that the trial court correctly found, prior to trial, that the settlement was given in good faith, this argument is meritless.

We recognize that consideration of the negligence of both parties and nonparties to an action is essential for determining liability commensurate with degree of total fault (*Bofman v. Material Service Corp.* (1984), 125 Ill. App. 3d 1053, 1064, 466 N.E.2d 1064), and that IPI Civil 2d No. A45.05, along with an appropriate pattern verdict form, must be given in all cases where the contributory negligence of the plaintiff is an issue. (See the Notes of Use of IPI Civil 2d No. A45.05.) However, the special verdict form submitted by the city does not follow the recommended IPI Civil pattern form, and, consequently, any objection to the form of verdict submitted by the court was waived. See *Auton v. Logan Landfill, Inc.* (1985), 105 Ill. 2d 537.

Although the trial court gave its own verdict form which did not require calculation of North Shore's negligence, and refused plaintiff's tendered instructions, consisting of IPI Civil 2d Nos. A45.05, 45.01 modified, and A45.06, any error could only prejudice plaintiff, not the city. This is because the purpose of considering the liability of nonparty tortfeasors is not to limit the city's share of responsibility, but to determine the extent of plaintiff's responsibility for his own in-

juries. (*Bofman v. Material Service Corp.* (1984), 125 Ill. App. 3d 1053, 1064, 466 N.E.2d 1064.) Here, since the jury found that the plaintiff was free from negligence, any error from the trial court's failure to submit the proper instructions and verdict form did not prejudice the city.

■■■ The city contends that the trial court should have directed a verdict in its favor or entered judgment *n.o.v.*, or alternatively granted a new trial, because plaintiff was contributorily negligent, the verdict was excessive, the sidewalk was not dangerous, and the city was not negligent. Verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelming favors movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) After carefully reviewing the record, we are satisfied that there was substantial evidence presented in support of plaintiff's claim so that the alleged negligence of the city, as well as the alleged contributory negligence of plaintiff, and the issues of damages, were questions for the jury.

■■■ The city next cites to many instances in plaintiff's closing argument that it contends were improper and highly prejudicial. The city first argues that the use in argument by plaintiff's counsel of a mathematical formula to calculate certain damages was improper.

Our supreme court in *Caley v. Manicke* (1962), 24 Ill. 2d 390, 182 N.E.2d 206, held that the use of a mathematical formula from which counsel may argue that an award for pain and suffering should be based upon a specific sum per fixed unit of time was impermissible. However, we believe the circumstances of the case at bar more nearly resemble the case of *Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 461 N.E.2d 551. First, the sums stated by plaintiff's counsel were presented as suggestions, not mandated formulas. (122 Ill. App. 3d 419, 430, 461 N.E.2d 551.) Counsel stated that he was "suggesting" figures and that what he said was "not gospel," and also said that what he found to be fair and reasonable the jury might not. (See *Watson v. City of Chicago* (1984), 124 Ill. App. 3d 348, 352-53, 464 N.E.2d 1100.) Second, while the city objected to portions of the argument that referred to compensation for inability to obtain future employment, and those objections were sustained, the city did not object to plaintiff's counsel's suggestion of a certain sum per year as damages for pain and suffering. The failure to object to errors in an opponent's closing argument is considered a waiver of the objection for review. (*Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill.

2d 591, 597-98, 294 N.E.2d 689.) Also, while the city did object to the use of a chart which set out an itemization of damages by counsel in final argument, the use of such a chart was expressly approved in *Caley v. Manicke* (1962), 24 Ill. 2d 390, 394, 182 N.E.2d 206.

■■■ Even if we were to find that this line of argument was improper and was objected to, it would not be so prejudicial as to require a new trial. The courts of this State have been reluctant to extend *Caley* beyond the precise facts presented therein and to hold a new trial is always required. Here, the argument in question was but a small portion of the total argument, and under the circumstances, does not require a new trial. *Watson v. City of Chicago* (1984), 124 Ill. App. 3d 348, 352, 464 N.E.2d 1100.

■■■ The city additionally complains of numerous other statements made by plaintiff's counsel during closing arguments. Only two of those statements, however, were objected to at trial, and on both occasions, the objection was sustained. Any possible prejudice resulting from these two remarks was cured under the facts here when the trial court promptly sustained the city's objection. *Smith v. Seiber* (1984), 127 Ill. App. 3d 950, 957, 469 N.E.2d 231.

■■■ As for the other remarks complained of on appeal, but not objected to, the rule generally adopted is that assignments of error based on alleged prejudicial conduct of opposing counsel will not be considered on appeal unless objection to the alleged prejudicial argument has been made in the trial court, a ruling of the trial court obtained and the record showing the objection and the ruling preserved, unless the remarks were so prejudicial that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration. (*Watson v. City of Chicago* (1984), 124 Ill. App. 3d 348, 353-54, 464 N.E.2d 1100.) The city alleges that statements by plaintiff's counsel, too numerous to detail here, served to bias the jury against a corporate municipality, and to improperly equate the city's stipulation that it received notice of plaintiff's injury to an admission by the city that the sidewalk was not reasonably safe, and were pure appeals to prejudice and sympathy.

We have carefully examined those portions of plaintiff's closing argument to which the city objects, and we are not persuaded that those remarks were prejudicial yet alone so outrageous that the parties were deprived of a fair trial and the judicial process suffered so as to ignore the city's failure to object below.

■■■ The city's last appellate contention is that the cumulative effect of errors could not be cured by the trial court's rulings and thus a new trial is mandated. Our examination of all of the assignments of

error claimed by the city discloses no errors such that, when taken together, there is cause for reversal and remandment for a new trial. Perfect trials exist only in fiction, and we are not called upon to insure that the record is totally free of error. (*Stromquist v. Burlington Northern Inc.* (1983), 112 Ill. App. 3d 37, 45, 444 N.E.2d 1113.) Rather, we have as our object to determine whether any error occurred which operated to the prejudice of the defendant or unduly affected the outcome below. (112 Ill. App. 3d 37, 45, 444 N.E.2d 1113.) No such error, individually or cumulatively, occurred here.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

SCHNAKE and HOPF, JJ., concur.